## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 71-cr-1913 (KBJ) |
| | ) | |
| LAVANCE GREENE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION</u>

In September of 1971, Defendant LaVance Greene committed a horrific crime: he disarmed three United States marshals to assist his half-brother in making a dramatic break from custody during a funeral furlough, and fatally shot a fourth marshal in the course of the planned escape. *See United States v. Greene*, 834 F.2d 1067, 1068–69 (D.C. Cir. 1987). Greene was convicted of both local and federal crimes after a jury trial in the U.S. District Court for the District of Columbia; in particular, the jury found him guilty of felony murder and armed robbery in violation of two provisions of the D.C. Code, and of rescue of a federal prisoner and the premediated murder of a federal officer, in violation of two federal statutes. *See id.* A federal district judge (Hart, J.) subsequently sentenced then-23-year-old Greene, and, upon exhausting his direct appeals in 1973, Greene was committed to the D.C. Department of Corrections to serve a prison term of 35 years to life.[1]

---

[1] Prior to the Sentencing Reform Act of 1984 ("the SRA"), judges in the federal system were authorized to impose indeterminate sentences with respect to persons who were convicted of federal crimes; consequently, the U.S. Parole Commission determined how much time a defendant would actually serve in prison (beyond the minimum period that the district judge prescribed). *See Tapia v. United States*, 564 U.S. 319, 323–24 (2011). Parole was abolished in the federal criminal justice system with the enactment of the SRA; however, federal defendants who were sentenced under the indeterminate sentencing scheme and who remained in custody after 1987 are still entitled to parole, and the U.S.

Today, nearly five decades later, Greene is a 72-year-old prisoner with various serious medical conditions who has filed a motion with this Court seeking compassionate release.  (*See* Def.'s Mot. for Compassionate Release ("Def.'s Mot."), ECF No. 12.)  Greene has the backing of numerous officers of the United States Bureau of Prisons ("BOP"), who have repeatedly testified during Parole Commission hearings that Greene is a completely reformed and model inmate whom they would welcome as a neighbor, and federal corrections officials became especially supportive of the prospect of Greene's release in the wake of his purportedly heroic effort to save two guards' lives in the midst of a prison riot 32 years ago.  Yet, in apparent deference to the understandable contrary views of the U.S. Marshals Service, and presumably in the interest of ensuring just punishment for the underlying criminal offense, the Parole Commission has repeatedly denied Greene's release request.

Before this Court at present is the motion for compassionate release that Greene has filed in this Court, which his counsel has expressly submitted pursuant to section 24-403.04 of the D.C. Code.  (*See* Def.'s Mot. at 1.)[2]  The D.C. Council enacted this compassionate release provision in April of 2020, and Greene maintains that because the D.C. Circuit overturned his federal convictions when his case was on appeal (and thus the only remaining crimes of conviction are his local offenses), it is the D.C. Code that authorizes this Court to reduce his sentence and release him from federal custody. The Government agrees with defense counsel that the D.C. Code's compassionate release provision is the applicable legal standard, but it argues that Greene is not

Parole Commission still reviews any such requests.

[2] Page-number citations to the documents that the parties and the Court have filed refer to the page numbers that the Court's Electronic Filing System ("ECF") automatically assigns.

entitled to release pursuant to that statute, largely due to the indisputably egregious nature of his original offense.

After careful consideration of the parties' submissions and for the reasons explained below, this Court concludes that Greene's motion must be construed as a motion for compassionate release under *federal* law—*i.e.*, as a motion for release pursuant to 18 U.S.C. § 3582(c)(1)(A)—rather than a motion brought under the D.C. Code, because a federal district judge's authority to modify a sentence that was previously imposed in federal court comes from Congress, not from the D.C. Council. Moreover, this Court has determined that, when Greene's motion is so construed, his request for compassionate release must be **GRANTED**. Greene's advanced age, 49 years of imprisonment to date, and current serious medical conditions unquestionably constitute "extraordinary and compelling reasons" that justify his release despite the abhorrent nature of his criminal offense. *See* 18 U.S.C. § 3582(c)(1)(A)(i); U.S. Sent'g Guidelines Manual § 1B1.13 cmt. n.1(B) (U.S. Sent'g Comm'n 2018). Moreover, in this Court's view, none of the purposes of punishment set forth in section 3553(a) of Title 18 of the U.S. Code warrant Greene's continued incarceration under the circumstances presented here. *See* 18 U.S.C. § 3582(c)(1)(A); *see also United States v. Johnson*, 464 F. Supp. 3d 22, 30 (D.D.C. 2020) (explaining that "whether or not a justified motion for compassionate release will be *granted* appears to turn on Congress's requirement that the court reassess the applicable section 3553(a) factors" and determine whether "it is necessary to maintain the prior term of imprisonment despite the extraordinary and compelling reasons to modify the defendant's sentence in order to achieve the purposes of punishment"). A separate Order consistent with this Memorandum Opinion will follow.

## I.   BACKGROUND

### A.   Greene's Criminal Offense

In 1971, Greene's half-brother, Randolph, was serving a 20-year sentence for armed bank robbery at Lewisburg Penitentiary, a federal prison in Pennsylvania.  *See United States v. Greene* ("*Greene I*"), 489 F.2d 1145, 1147, 1159 (D.C. Cir. 1973).[3] When Randolph's father passed away, prison officials permitted him, "at his mother's request," to attend his father's funeral service in Washington, D.C., under the supervision of four U.S. marshals.  *Id.*  Once the funeral service was underway, Greene entered the "crowded church" with a gun and managed to disarm three of the marshals, freeing Randolph from their custody.  *Id.*  The brothers then attempted to flee the scene, but they encountered a fourth U.S. marshal outside of the church.  *See id.*  A gun battle ensued, during which Greene fatally shot the marshal and accidentally shot Randolph as well.  (*See id.*; Def.'s Mot. at 4–5; Ex. A to Def.'s Mot., ECF No. 12-1, at 4.)

According to the Government's account of the offense, which is apparently based on the description of the crime that appears in Randolph's presentence investigation report, Greene stood over the marshal's body as he "lay helpless on the pavement" and shot him twice more.  (*See* Gov't Opp'n to Def.'s Mot. for Compassionate Release ("Gov't Opp'n"), ECF No. 13, at 3; *see also* Ex. M to Def.'s Mot., ECF No. 12-1, at 41.)  Greene has forcefully contested this version of the facts both at his parole hearings and before this Court (*see* Ex. M to Def.'s Mot. at 40–41; Def.'s Reply to Gov't Opp'n ("Def.'s Reply"), ECF No. 14, at 10); as Greene remembers the incident, both the

---

[3] Due to the significant passage of time since Greene's conviction and sentencing, the trial transcripts and sentencing documents from his case are no longer available.  (*See* Def.'s Mot. at 5.)  The offense-related facts in this Memorandum Opinion are primarily drawn from the D.C. Circuit's decision on Greene's appeal of his conviction.

marshal and Randolph were lying on the ground at the end of the gun battle, and Greene "looked at both of them in an effort to a[ss]ess what had happened" before helping his brother up and running away (*see* Ex. M to Def.'s Mot. at 41).  Greene further contends that he was under the influence of heroin, alcohol, and marijuana at the time he committed the offense, and was likely "experiencing a drug induced psychosis" (Ex. A to Def.'s Mot. at 4); yet, he insists that he did not fire any additional shots at the marshal after he fell to the ground (*see* Ex. M to Def.'s Mot. at 40–41; Def.'s Reply at 10).

It is undisputed that, after the shooting, Greene and Randolph commandeered a car at gunpoint and sped away.  *Greene I*, 489 F.2d at 1147.  Multiple police officers then pursued the brothers on a high-speed chase, and after a few miles, both brothers were apprehended and arrested.  *Id.*

### B.    Procedural History

About a month after these horrific events, Greene was indicted in the United States District Court for the District of Columbia of seven D.C. Code and federal law offenses.  Specifically, he was charged with felony murder and four counts of armed robbery in violation of D.C. Code §§ 22-2401, 2901, 3202 (1973), and of rescue of a federal prisoner and premediated murder of a federal officer, in violation of 18 U.S.C. §§ 752(a), 1114 (1970).  *Greene I*, 489 F.2d at 1150, 1158; *see also id.* at 1160 & nn.2–5 (statement of Chief Judge Bazelon as to why he would grant rehearing en banc).  Significantly for present purposes, the United States District Court for the District of Columbia has authority to exercise jurisdiction over local criminal offenses that are properly joined with federal offenses in an indictment, *see* District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358, § 111, 84 Stat. 473,

478 (codified at D.C. Code § 11-502(3)), and as a result, Greene was tried for both the local crimes and the federal offenses at the same time, and in federal district court, *see Greene I*, 489 F.2d at 1147.  During the trial, Greene asserted that he was insane at the time he committed the criminal acts, but a jury rejected this defense, and convicted him of all charges.  *See United States v. Greene* ("*Greene II*"), 834 F.2d 1067, 1069 (D.C. Cir. 1987).  Judge George Hart, Jr. then sentenced Greene to an aggregate term of 440 months to life in prison.  (*See* Criminal Docket Sheet, ECF No. 1, at 6.)[4]

In 1973, the D.C. Circuit affirmed Greene's D.C. Code convictions, but vacated his federal law convictions, on the grounds that (1) "there had been a 'merger' between the felony murder count and the rescue felony on which it was based[,]" and (2) the district court's "application of the D.C. insanity burden to U.S. Code offenses raised a serious equal protection issue" that could be avoided by vacating the federal law convictions.  *Greene II*, 834 F.2d at 1069–70 (synthesizing the D.C. Circuit's holdings with respect to Greene's direct appeal).  Because the sentence for premeditated murder of a federal officer ran concurrently with the D.C. Code felony murder charge (*see* Criminal Docket Sheet at 6), Greene's minimum sentence was ultimately reduced only by 20 months (*see id.*), leaving him with a total sentence of 35 years to life in prison (*see* Ex. B to Def.'s Mot., ECF No. 12-1, at 10).

Following his appeal, Greene filed a motion under 28 U.S.C. § 2255 to set aside his sentence for felony murder, given that the D.C. Circuit had vacated his conviction

---

[4] Greene was sentenced to 20 years to life for felony murder; 15 years to life for armed robbery; 15 years to life for premeditated murder of a federal officer; and 20 months to 5 years for rescuing a prisoner.  (*See* Criminal Docket Sheet at 4, 6.)  The sentences for rescue of a prisoner and one count of armed robbery were to be served consecutively to the sentence for felony murder, while the sentences for premeditated murder and the three remaining counts of armed robbery were to run concurrently with the felony murder sentence.  (*See id.* at 6.)

for the underlying felony. *Greene II*, 834 F.2d at 1070.  The district court (Pratt, J.) denied Greene's motion, and the D.C. Circuit affirmed that denial on appeal. *Id.* at 1074.

### C.     Greene's Incarceration And Parole Commission Hearings

To serve his affirmed prison sentence, Greene was initially incarcerated at Lorton Reformatory in Virginia, a prison run by the D.C. Department of Corrections, and he remained at that facility for approximately three decades.  (Def.'s Mot. at 8.) There is no dispute that, while at Lorton, Greene took advantage of numerous programming and employment opportunities "in an effort to prepare for his eventual release."  (Letter of Dr. Rosalyn Miles, Ex. I to Def.'s Mot., ECF No. 12-1, at 27.)  For instance, Greene took courses at the University of the District of Columbia Lorton Prison College Program; became proficient in various computer, software, and office management skills; and worked as a clerk and secretary at the prison's medical unit. (*See id.* at 27–28.)

Greene also managed to endear himself to corrections officials, when, in 1989, he risked his own life to protect two officers during a violent prison riot.  According to a letter that one of the two officers wrote in the wake of the incident, inmates "armed with bricks, steel rods, chairs, [and] a steel mopbucket" attempted to take control of the facility, causing the two officers to run into a stairway, where they soon became trapped.  (*See* Letter of Clifford L. Fanucci, Jr. ("Fanucci Letter"), Ex. D to Def.'s Mot., ECF No. 12-1, at 16.)  As the officers heard "an untold number of residents shouting to kill the officers" (*see id.*), Greene stepped in and "convince[d] the other residents who were tr[y]ing to injure [the officers] to refrain from their violent actions" (Def.'s Mot. at 12).

For these purportedly heroic and selfless acts—and also his concerted efforts to improve himself while in prison—Greene earned the recognition and praise of individuals both inside and outside of Lorton Reformatory, including the Director of the D.C. Department of Corrections, former mayor Marion Barry (who was at that point a member of the D.C. Council), and two D.C. Councilmembers.  (*See* Letter of Director Margaret Moore, Ex. E to Def.'s Mot., ECF No. 12-1, at 18; Letter of Marion Barry, Jr. ("Barry Letter"), Ex. F to Def.'s Mot., ECF No. 12-1, at 20–21; Letter of Councilmember Frank Smith, Jr. ("Smith Letter"), Ex. G to Def.'s Mot., ECF No. 12-1, at 23; Letter of Councilmember Harry L. Thomas, Sr., Ex. H to Def.'s Mot., ECF No. 12-1, at 25.)  Some of these officials even advocated for Greene's early release, specifically citing his rehabilitation and service to the prison community.  (*See, e.g.*, Barry Letter at 21 (advocating for a good time credit award); *see also* Smith Letter at 23 (urging the Director of the D.C. Department of Corrections to afford Greene a parole hearing).)

In 2001, Greene was transferred from Lorton into BOP custody, where he remains to date.  (Def.'s Mot. at 8.)  Greene has continued to engage in extensive programming and educational opportunities while in the federal prison system; for example, he has completed vocational and educational training programs in music, culinary arts, public speaking, Spanish, criminal thinking, and drawing; has obtained his GED; has used his own money to pay for an advanced computer training course at a local community college; and has successfully finished various drug abuse treatment and education programs.  (*See* Ex. A to Def.'s Mot. at 5; Ex. M to Def.'s Mot. at 41; Ex. O to Def.'s Mot., ECF No. 12-1, at 49–50; Ex. P to Def.'s Mot., ECF No. 12-1, at 52–53; Ex. Q to Def.'s Mot., ECF No. 12-1, at 59.)  Greene has also been heavily

involved as a sewing machine operator and instructor at the BOP's UNICOR Program, where he has received exemplary performance reviews and is considered an "outstanding" worker.  (*See* Ex. M to Def.'s Mot. at 41; Ex. S to Def.'s Mot., ECF No. 12-1, at 66.)  In addition, Greene has acted as a peacekeeper between inmates and officers, and has thereby helped to prevent violence in the prison community.  (*See* Letter of Chrystal McKenzie ("McKenzie Letter"), Ex. J to Def.'s Sealed Mot., ECF No. 9-3, at 30; Letter of Mark Cantrell ("Cantrell Letter"), Ex. K to Def.'s Sealed Mot., ECF No. 9-3, at 32.)

During the past seventeen years in BOP custody, Greene has appeared before the U.S. Parole Commission at least six times.  At his initial hearing in 2003, the Commission denied Greene parole for reasons that are not entirely clear from the record before the Court, and set a reconsideration hearing for three years later.  (*See* Ex. C to Gov't Opp'n, ECF No. 13-2, at 1–3.)  In 2006, the Commission again denied Greene parole, accepting the assigned hearing examiner's recommendation to continue further reconsideration of the matter until 2009.  (Ex. M to Def.'s Mot. at 40; Ex. N to Def.'s Mot., ECF No. 12-1, at 45–46.)  The hearing examiner acknowledged that Greene had "been used as a resource by staff by acting as a role model for other inmates[,]" and that Greene had "engaged in extensive assistance to the institution"; however, the examiner ultimately concluded that the seriousness of Greene's crime outweighed "his positive adjustment to incarceration."  (*See* Ex. N to Def.'s Mot. at 45.)  In the hearing examiner's view, Greene's "cold blooded execution" of a law enforcement officer exhibited a "callous disregard for human life" that rendered him a serious threat to the community, even 35 years after he had committed that heinous act.  (*See id.* at 46.)

When Greene next appeared before the Parole Commission in 2009 and 2010, the assigned hearing examiner reached a different conclusion.  During the hearings, the examiner heard testimony from Greene's case manager regarding Greene's phenomenal work record, his role as "a mentor to younger inmates[,]" and the respect that he had consistently shown towards BOP staff.  (*See* Ex. L to Def.'s Mot., ECF No. 12-1, at 35.)  Additionally, the institution's captain, who had attended only one other parole hearing in his 35 years at BOP, came to advocate on Greene's behalf.  In his testimony, the captain stated that Greene was "an outstanding inmate who ha[d] provided considerable cooperation and assistance to prison staff[,]" and that he showed a "genuine concern for the safety of staff and other prisoners."  (Def.'s Mot. at 15.)  Greene also read aloud a letter that he had written to the Marshals Service in 1985 detailing his "profound remorse and regret" for his actions, and explaining that the guns "just started firing[,]" and that he did not mean to kill the marshal.  (*See* Ex. L to Def.'s Mot. at 35, 37.)  In response, the Marshals Service submitted a letter to the Parole Commission opposing Greene's release in light of the "extremely serious" nature of his offense.  (*See id.* at 34–35.)  Based on all of the evidence presented, the hearing examiner recommended Greene's release, noting that he had been "a model prisoner and expresses genuine remorse for his crime."  (*See id.* at 35–36.)  But the Commission disagreed with the examiner's recommendation, and denied Greene parole yet again, citing the "brazen and vicious" nature of Greene's crime, and the fact that Greene had suggested that his offense was unintentional in the letter he wrote to the Marshals Service—a characterization that, in the Commission's view, demonstrated Greene's failure to accept full responsibility for his actions.  (*See* Ex. E to Gov't Opp'n, ECF No. 13-3, at 1; Ex. L to Def.'s Mot. at 36–37.)

By the time Greene's next hearing came around in 2015, numerous BOP officials appeared before the Commission to provide testimony in support of his release.  For instance, three BOP officials testified that Greene frequently went out of his way to facilitate the safety and wellbeing of the prison community.  (*See* Ex. A to Def.'s Sealed Mot., ECF No. 9-3, at 2–3.)  Another BOP official, one who supervised Greene's work in the culinary unit, stated that Greene "has shown a genuine concern for the safety and welfare of BOP personnel" and that he "was a personal recipient of [Greene's] concern when he experienced a medical crisis while in the institution and [Greene] came to his aid."  (Ex. A to Def.'s Mot. at 3.)  Two additional BOP officials spoke to Greene's "exemplary work ethic" (*see id.*), and out of the seven BOP officials who testified at the hearing, two specifically voiced their support for having Greene as their neighbor (*see id.*).  The assigned hearing examiner also received letters from the U.S. Marshals Service and a friend of the victim's family urging the Commission to deny Greene parole, while the victim's nephew (who formerly worked as a correctional officer himself) wrote a letter saying that he did not oppose Greene's release.  (*See id.* at 2, 5.)

In addition to hearing these statements for and against Greene's parole, the hearing examiner also considered a recent disciplinary infraction that Greene had incurred for throwing grits on a staff member.  (*See id.* at 4.)  However, after reviewing all of the evidence concerning that incident and otherwise, the hearing examiner recommended granting Greene parole due to his "obvious concern for the welfare of others" and given the enormous respect that he had earned among BOP staff.  (*See id.* at 6.)  The hearing examiner also noted that, as a former substance abuse counselor at Lorton Reformatory, she had "personally witnessed" Greene's concern for others,

including employees such as herself.  (*See* Ex. A to Def.'s Sealed Mot. at 6.)  Yet, notwithstanding the hearing examiner's recommendation, Greene was again denied parole.  According to the executive reviewer's statement of reasons, Greene's disciplinary infraction, along with his original offense, demonstrated that he still posed a danger to the community and that he lacked self-control.  (*See* Ex. A to Def.'s Mot. at 6–7.)

Greene last appeared before the Parole Commission in 2017.  Consistent with its prior decisions, the Commission denied Greene parole, this time on the ground that his offense of conviction was extremely serious, and that, since his last parole hearing, Greene had incurred another disciplinary infraction for possessing a dangerous weapon and threatening correctional staff.  (*See* Ex. F to Gov't Opp'n, ECF No. 13-4, at 1.)[5] The record does not provide a definitive account of the circumstances underlying this alleged disciplinary infraction, but, according to Greene, the dangerous weapon was a "four-inch piece of plastic that he used to trace straight lines for his artwork as part of his Pen and Ink Drawing course[,]" and that he had "reacted verbally" when the officers took it away from him, in part because he "was forcibly kept out of his cell while the disposal of his possessions took place."  (Def.'s Mot. at 19.)  Greene's next parole hearing is set for September of 2022.  (*See* Ex. B to Def.'s Mot. at 11.)

### D.  Greene's Compassionate Release Motion

Greene is now 72 years old, and has served 49 years of his prison sentence.  (*Id.* at 9, 11.)  On November 24, 2020, Greene's counsel filed a motion for compassionate

---

[5] It is not clear whether the assigned hearing examiner had recommended that the Commission deny Greene parole, because the record does not include a summary of the 2017 hearing or the hearing examiner's recommendation.

release in this Court under D.C. Code § 24-403.04.  (*See* Def.'s Sealed Mot. for Compassionate Release, ECF No. 4.)  D.C. Code § 24-403.04 authorizes "the court" to modify a D.C. Code offender's term of imprisonment under certain enumerated circumstances, which take into account a defendant's age, medical conditions, and time spent in prison.  *See* D.C. Code § 24-403.04(a).  Greene argues that he is eligible for relief under that statute given his age and number of years incarcerated, as well as his numerous medical conditions—specifically, severe urinary incontinence (Mot. Hr'g Tr. at 26:5–23), primary hypertension, "undiagnosed congestive heart failure[,]" "a latent tuberculosis infection, hypermetropia (a vision condition), dermatophytosis (fungal infections), abdominal hernia, shingles, and dermatitis resulting in distressing skin lesions" (Def.'s Mot. at 25–28).  The motion also contends that Greene is no longer a danger to the community, as evidenced by his "minimum" rating on the standard PATTERN risk assessment scale (*see id*. at 17), and the fact that numerous BOP officials have observed his behavior and have expressed support for his release (*see id*. at 14–16).  Greene additionally points to the steps that he has taken in prison to rehabilitate himself and to make amends for his crime, such as saving the lives of correctional officers during the prison riot at Lorton Reformatory (*see id.* at 11), and working with BOP staff to ensure the safety of the prison community (*see id.* at 15).  As for his disciplinary record, Greene stresses that not one of his infractions while in prison resulted in physical harm to another person, and that a BOP official who is familiar with his prison record has stated that Greene does not have a serious disciplinary history to any meaningful extent.  (*See id.* at 19; *see also* Cantrell Letter at 32.)

On December 2, 2020, this Court issued a Minute Order directing the

Government to respond to Greene's motion for compassionate release.  (*See* Min. Order of Dec. 2, 2020).  In the order, the Court also instructed the parties to address the applicability of the *federal* compassionate release statute in addition to the D.C. compassionate release statute, and to discuss Greene's entitlement to relief under both statutory schemes.  (*See id.*)  The Government filed an opposition to Greene's motion on December 9, 2020, and Greene filed a reply thereto on December 14, 2020.  (*See* Gov't Opp'n at 14; *see also* Def.'s Reply at 17.)

In its opposition brief, the Government maintains that the D.C. compassionate release statute is the proper statute to apply to this case, because Greene is serving time for D.C. Code offenses; in the Government's view, the federal compassionate release statute does not apply to D.C. Code offenders even if they were sentenced in federal court.  (*See* Gov't Opp'n at 1 n.1.)  The Government additionally asserts that Greene is not entitled to compassionate release under the D.C. compassionate release statute, because he committed a "violent murder of an on-duty [U.S.] Marshal" and "has minimized his role in the offense throughout the years[.]"  (*Id.* at 2.)  The Government also emphasizes that the U.S. Marshals Service opposes Greene's motion, and that the Parole Commission has consistently denied Greene's requests for release.  (*See id.*)

In his reply, Greene also contends that this Court should apply the D.C. compassionate release statute to his case, because, in his view, the D.C. statute's eligibility standards are more generous than those of the federal statute.  (*See* Def.'s Reply at 2–7.)  Yet, he further argues that, if the Court does apply the standards set forth in 18 U.S.C. § 3582(c)(1)(A), it should find that his advanced age, lengthy period of incarceration, and medical ailments constitute "extraordinary and compelling reasons" that warrant his release.  (*Id.* at 7, 9; *see also* Def.'s Mot. at 26.)

On December 18, 2020, this Court held a hearing on Greene's motion.  (*See* Min. Entry of Dec. 18, 2020.)  Defense counsel waived Greene's presence at the hearing, both to expedite this Court's review of Greene's motion and also because Greene's urinary incontinence prevented him from sitting through a court hearing without interruption.  (Mot. Hr'g Tr. at 26:14–20.)  At the end of the hearing, the Court advised the parties that it would issue a ruling after carefully considering the full evidentiary record and the parties' oral and written submissions.  (*Id.* at 44:3–9.)  The Court has now completed that review.

## II.    LEGAL STANDARDS

### A.    Section 3582(c)(1)(A) Of Title 18 Of The U.S. Code

As a general matter, federal courts are "forbidden . . . to modify a term of imprisonment once it has been imposed[.]"  *Freeman v. United States*, 564 U.S. 522, 526 (2011) (internal quotation marks and citation omitted); *see also* 18 U.S.C. § 3582(c).  Section 3582(c)(1)(A) of Title 18 provides one exception to this general rule.  As amended by the First Step Act of 2018, section 3582(c)(1)(A) authorizes federal courts to entertain a motion for a sentence reduction brought by the Director of the BOP or by the defendant, and thereby reduce a term of imprisonment that was previously imposed, provided that the following conditions are met.

First, in cases where a defendant moves for compassionate release under section 3582(c)(1)(A), the court can hear such a motion only "after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 U.S.C. § 3582(c)(1)(A). As this Court has explained in prior opinions, *see, e.g.*, *Johnson*, 464 F. Supp. 3d at 28–

29, section 3582(c)(1)(A)'s exhaustion requirement is non-jurisdictional, and a court may therefore excuse a defendant's failure to exhaust his administrative rights "where, among other things, the agency will almost certainly deny any relief either because it has a preconceived position on, or lacks jurisdiction over, the matter[,]" *id.* at 29 (internal quotation marks and citation omitted).

Next, even if a defendant satisfies section 3582(c)(1)(A)'s exhaustion requirement (or if the court finds that exhaustion would be futile), the defendant must also demonstrate that he meets one of the statute's two eligibility criteria.  Under the first prong of section 3582(c)(1)(A), a defendant may be eligible for compassionate release if "extraordinary and compelling reasons" justify reducing his term of imprisonment.  18 U.S.C. § 3582(c)(1)(A)(i).  Congress does not specify what counts as an "extraordinary and compelling reason[,]" *see id.*, but it expressly delegated to the Sentencing Commission the authority to define the circumstances that, if present, would satisfy that standard, *see* 28 U.S.C. § 994(t).  Accordingly, the Sentencing Commission has identified four general categories of circumstances that qualify as "extraordinary and compelling" reasons for release, including a defendant's age, medical issues, family circumstances, or "other" exceptional situations.  *See* U.S. Sent'g Guidelines Manual § 1B1.13 cmt. n.1.  For example, under the "Age of the Defendant" provision of section 1B1.13 of the Sentencing Guidelines Manual, extraordinary and compelling circumstances that warrant a sentence modification exist where the defendant "(i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."  *Id.* § 1B1.13 cmt. n.1(B).

A defendant can also demonstrate eligibility for compassionate release under the second prong of section 3582(c)(1)(A) (without having to establish extraordinary and compelling circumstances) if he is "at least 70 years of age, has served at least 30 years in prison," and "a determination has been made by the Director of the [BOP] that the defendant is not a danger to . . . the community[.]"  18 U.S.C. § 3582(c)(1)(A)(ii). However, unlike the extraordinary and compelling circumstances prong, which applies to defendants serving sentences for any crime, this provision applies only to defendants serving mandatory life sentences for certain "serious violent felonies[.]"  *See id.* § 3559(c)(1); *see id.* § 3582(c)(1)(A)(ii) (limiting eligibility to those serving a sentence under section 3559(c)).

Finally, even when the court determines that the defendant satisfies section 3582(c)(1)(A)'s eligibility requirements, the court may reduce the defendant's term of imprisonment only if it finds that a sentence reduction would not interfere with the purposes of punishment set forth in section 3553(a).  *See id.* § 3582(c)(1)(A).  In making this determination, the Court considers such factors as "the nature and circumstances of the offense[,]" the "history and characteristics of the defendant[,]" and the need "to protect the public from further crimes of the defendant[.]"  *Id.* § 3553(a)(1)–(2).

**B.    Section 24-403.04 Of The D.C. Code**

In April of 2020, the Council of the District of Columbia enacted a compassionate release statute that is loosely modeled on section 3582(c)(1)(A).  *See* D.C. Code § 24-403.04; *see also COVID-19 Response Supplemental Emergency Amendment Act of 2020*, 23d Leg., 27th Sess. (D.C. 2020) (statement of Councilmember Allen, 48:10–48:26).  Section 24-403.04 of the D.C. Code permits "the court" to modify

a D.C. Code offender's term of imprisonment under certain enumerated circumstances, which include a defendant's age, medical conditions, and time spent in prison. *See* D.C. Code § 24-403.04(a).  As relevant here, D.C. Code offenders may be eligible to have their terms of imprisonment reduced under section 24-403.04(a) if they are at least 60 years old and have served 25 years or more in prison, or if:

> Other extraordinary and compelling reasons warrant such a modification, including . . .
>
> Elderly age, defined as a defendant who:
>
>> (i) Is 60 years of age or older;
>>
>> (ii) Has served at least 20 years in prison or has served the greater of 10 years or 75% of his or her sentence; and
>>
>> (iii) Suffers from a chronic or serious medical condition related to the aging process or that causes an acute vulnerability to severe medical complications or death as a result of COVID-19[.]

*Id.* § 24-403.04(a)(2), (3)(B).

In order to grant a defendant's motion for compassionate release under D.C. Code § 24-403.04, the court must determine not only that the defendant meets the statute's eligibility criteria, but also that the defendant is no longer a danger to the community "pursuant to the factors to be considered in 18 U.S.C. §§ 3142(g) and 3553(a) and evidence of the defendant's rehabilitation while incarcerated[.]" *Id.* § 24-403.04(a).[6]  But, unlike the federal compassionate release statute, D.C. Code § 24-

---

[6] Section 3142(g) lists the criteria that a court must consider in the pre-trial detention context, when it decides "whether there are conditions of release that will reasonably assure the appearance of the person [at trial] as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(g).  These factors include "the nature and circumstances of the offense charged, [and] whether the offense is a crime of violence," "the weight of the evidence against the person[,]" "the history and characteristics of the person[,]" and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  *Id.*  Thus, the prescribed section 3142(g) factors are substantially similar to the factors that a federal court must consider under section 3553(a), prior to sentencing a defendant.  *See id.* § 3553(a); *id.* § 3582(a) (requiring a court to consider the factors set forth in section 3553(a) when imposing a term of imprisonment).

403.04 permits courts to grant relief without first requiring the defendant to exhaust administrative remedies.  *See id.* § 24-403.04(b).

## III.   ANALYSIS

Greene's status as a federal inmate who is presently serving time in BOP custody solely for local offenses presents an anomalous compassionate release situation that is unique to this jurisdiction.  This is an unusual scenario because federal courts typically lack jurisdiction over state and local offenses, but in the District of Columbia, Congress has authorized federal district courts to exercise jurisdiction over "[a]ny offense under any law applicable exclusively to the District of Columbia . . . [that] is joined in the same information or indictment with any Federal offense."  D.C. Code § 11-502(3).[7] Thus, although Greene was sentenced by a federal district judge in federal district court, his punishment is presently being carried out exclusively in relation to his D.C. Code offenses, and such circumstances beg the threshold question of *which* set of legal standards this Court can (or must) use to evaluate his release request.  That is, should this Court apply the compassionate release standards that D.C.'s local legislature recently enacted to provide relief for D.C. Code offenders, or should the Court apply

---

[7] This limited grant of jurisdiction over local criminal offenses stems from the unique history of the court system in the District of Columbia, where Congress has constitutional authority to "legislate for the District" by "defin[ing] certain crimes in the D.C. Code" and by dictating the forum in which cases involving such crimes can be heard.  *See United States v. Belt*, 514 F.2d 837, 843 (D.C. Cir. 1975) (citing U.S. Const. art. I, § 8, cl. 17).  Until 1970, Congress had provided the U.S. District Court for the District of Columbia with "exclusive jurisdiction over felony offenses, even though committed in violation of locally applicable laws[,]" meaning that "the District Court was filling the role of both a local and federal court."  *Palmore v. United States*, 411 U.S. 389, 392 n.2 (1973).  Congress changed this system when it enacted the District of Columbia Court Reform and Criminal Procedure Act of 1970, which "create[d] an independent judicial system to be responsible for 'local' matters, and . . . free[d] the federal courts of the District of that responsibility."  *Belt*, 514 F.2d at 842 (internal quotation marks and citation omitted).  However, the Act also authorizes the federal court to retain jurisdiction over local offenses that are properly joined with a federal offense, in order to allow United States attorneys dealing with defendants "accused of infractions which are both Federal and purely local violations" to "handle all charges with minimal procedural difficulties[.]"  *United States v. Jackson*, 562 F.2d 789, 799 (D.C. Cir. 1977) (quoting H.R. Rep. No. 91-907, at 33 (1970)).

the compassionate release statute that Congress has included in the U.S. Code and that would otherwise govern this Court's ability to modify a term of imprisonment that a federal judge previously imposed?

The parties here insist that the D.C. Code's release provision governs defendants like Greene, who are federal inmates serving time for exclusively D.C. Code offenses (*see* Gov't Opp'n at 1 n.1; Def.'s Reply at 2–7), but this Court concludes that the standards that Congress has set forth in 18 U.S.C. § 3582(c)(1)(A) must apply, for the reasons explained below.  And when those standards are applied to the instant circumstances, the Court further finds that the statutory exhaustion requirement must be waived as futile; that Greene's age and medical conditions qualify as extraordinary and compelling circumstances that justify his release for the purpose of section 3582(c)(1)(A); and that the 49 years of incarceration that Greene has served to date for his reprehensible crime are sufficient to promote the statutory goals of punishment for the purpose of the federal compassionate release statute, such that Greene's continued incarceration is not required.

### A.   Federal Law, And Not The D.C. Code, Governs Greene's Motion For Compassionate Release

The Court's analysis of the threshold question of which set of legal standards applies begins—and ends—with foundational principles of federal-court jurisdiction. To start, it is clear beyond cavil that *Congress* decides "what cases the federal courts have jurisdiction to consider[,]" including "when, and under what conditions, federal courts can hear them."  *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007); *see also Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (explaining that federal courts "have only the power that is authorized by Article III of the Constitution

and the statutes enacted by Congress pursuant thereto").  Moreover, and as relevant here, Congress has specifically authorized federal courts to exercise jurisdiction over individuals who have been accused of violating criminal provisions of the D.C. Code when the individual is also charged with a federal offense and the local and federal offenses are properly joined in an indictment or information pursuant to Federal Rule of Criminal Procedure 8(a).  *See* D.C. Code § 11-502(3); *supra* note 7; *see also* Fed. R. Crim. P. 8(a) (stating that an "indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction").  Notably, federal courts may also retain jurisdiction over local offenses even after the federal offenses have "faded from the case[.]"  *United States v. Malenya*, 736 F.3d 554, 556 (D.C. Cir. 2013) (internal quotation marks and citation omitted) (explaining that "[d]isposition of the federal offense after proper joinder does not withdraw power over the local offense").

It is also well established that federal courts must apply the substantive law of the District of Columbia that underlies a given D.C. Code offense in the context of any such adjudication.  *See, e.g.*, *Greene II*, 834 F.2d at 1072 (explaining that "where a defense of insanity is interposed to a [D.C. Code] felony murder prosecution" in federal court, the "standard for determining sanity is the one specified for the crime of felony murder").  But because the entire point of giving federal courts the authority to adjudicate D.C. Code offenses was to "eliminat[e] the 'procedural difficulties' of trying a single defendant for related federal and D.C. Code offenses in two courts," *United States v. Garnett*, 653 F.2d 558, 561 (D.C. Cir. 1981), the D.C. Circuit has repeatedly held that a single set of procedural rules—the rules that govern federal courts—apply with respect to the federal court's adjudication of alleged criminal violations of the

D.C. Code, *see, e.g.*, *Belt*, 514 F.2d at 844 (holding that, where a defendant is tried for local and federal offenses in district court, "the federal forum's evidentiary law" governs because it "is patently not feasible for the [court] to try [such] a defendant" under two sets of evidentiary rules); *United States v. Brown*, 483 F.2d 1314, 1315–17 (D.C. Cir. 1973) (holding that federal courts must apply the federal bail provisions rather than those of the D.C. Code, even when the defendant was convicted of only local offenses).

Against this backdrop, the Court sees nothing in the Federal Code or in the Federal Rules of Criminal Procedure that evinces any congressional intent to require that a different set of procedural standards apply to the D.C. Code offenders that are prosecuted in federal court than the standards that a federal district judge must apply to offenders who are haled into federal court as alleged violators of federal law.  *See Brown*, 483 F.2d at 1316 ("[T]here [is no] question but that the Federal Rules apply to all criminal cases in the Federal Courts.").  For instance, with respect to criminal cases brought in federal court, the U.S. Code and Federal Rules dictate matters such as whether and under what circumstances the court can (1) accept a defendant's guilty plea, *see* 18 U.S.C. § 3438; Fed. R. Crim. P. 11; (2) order the defendant detained pending trial, *see* 18 U.S.C. § 3142; Fed. R. Crim. P. 46; or (3) preside over any trial, 18 U.S.C. § 3441; Fed. R. Crim. P. 23.  Moreover, if a criminal defendant is convicted in federal court, federal law is unquestionably the source of a federal district judge's sentencing authority.  *See* 18 U.S.C. § 3551; Fed. R. Crim. P. 32.  In that regard, section 3551 of Title 18 of the U.S. Code plainly requires that "a defendant who has been found guilty of an offense described in any Federal statute" must "be sentenced in accordance with the provisions of this chapter so as to achieve the purposes [of punishment] set

22

forth in . . . section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case."  18 U.S.C. § 3551(a).[8]  Section 3553(a), in turn, instructs federal judges to consider the purposes of punishment in light of various factors, such as "the need for the sentence imposed" to "reflect the seriousness of the offense, [] promote respect for the law, and [] provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; "to protect the public from further crimes of the defendant"; and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"  *Id.* § 3553(a)(2)(A)–(D).

Significantly for present purposes, federal law also establishes the circumstances under which a federal district judge can change a sentence that the court has previously imposed.  Section 3582(c) states unequivocally that "[t]he court may not modify a term of imprisonment once it has been imposed" except if certain specified circumstances exist.  *Id.* § 3582(c).  This is a jurisdictional provision that allows the court to modify a prior sentence after its imposition, and, in effect, it binds the court to make such a sentence modification only under the conditions prescribed.  *See Johnson*, 464 F. Supp. 3d at 27 (noting that, "absent such statutory authorization," courts would lack the power to modify a term of imprisonment once it has been imposed).  Thus, the fact that the D.C. Council might allow courts under *that* legislative body's authority to change sentences under various circumstances that are laid out in the D.C. Code does not, and cannot, govern *this* Court's authority to do so.  *Cf. Kokkonen v. Guardian Life Ins. Co.*

---

[8] For the reasons explained in note 9, *infra*, it is the Court's view that the exemption in section 3551(a) for "an Act of Congress applicable exclusively in the District of Columbia" does not compel the conclusion that such federal standards are inapplicable under the circumstances presented here.

*of Am.*, 511 U.S. 375, 377 (1994) (explaining that federal courts cannot expand the scope of their jurisdiction "by judicial decree").  Put another way, because a term of imprisonment that a federal court orders in any criminal case over which it has jurisdiction qualifies as "a term of imprisonment" that was "once . . . imposed" for the purpose of section 3582(c), any such term of imprisonment—whether it pertains to federal law offenses, D.C. Code offenses, or both—can only be modified pursuant to section 3582(c) of Title 18 of the U.S. Code *as a jurisdictional matter*.  Consequently, this Court is of the view that it really has no choice but to evaluate Greene's request for modification of his previously imposed 35-years-to-life sentence under that provision of the U.S. Code.[9]

In resisting the conclusion that the federal compassionate release statute governs Greene's request for release, both parties make arguments that are based upon a fundamental misconception of the scope of a federal court's jurisdiction and the nature of section 3582(c)(1)(A)'s grant of authority.  For example, the Government maintains

---

[9] To the extent that section 3551 appears to address the sentencing of D.C. Code offenders *as distinguished from* federal offenders and suggests that the chapter's statutory sentencing provisions (including perhaps section 3582(c)) are inapplicable to offenders accused of violating the D.C. Code, *see* 18 U.S.C. § 3551(a) (referencing defendants found guilty of offenses "described in any Federal statute, . . . other than an Act of Congress applicable exclusively in the District of Columbia"), this Court rejects the conclusion that Congress intended for local law, instead of federal law, to provide the authority for sentencing modifications for D.C. Code offenders such as Greene, for several reasons.  First of all, section 3551 was enacted by Congress as part of the SRA in 1984, which is long after Greene's conviction and sentencing, so it is not at all clear what Congress intended concerning the sentencing of pre-SRA D.C. Code offenders like Greene, or whether any such intention could survive constitutional scrutiny in light of the Ex Post Facto doctrine, *see* U.S. Const. art. I, § 9, cl. 3.  The utility of section 3551's apparent exclusion is also manifestly limited under these circumstances, because Greene *was* initially "found guilty of an offense described in a[] Federal statute," 18 U.S.C. § 3551, and it was only *after* his sentencing that Greene's convictions on the federal charges were vacated.  Finally, and perhaps most importantly, by its own terms, section 3551's carveout for D.C. Code offenders pertains simply and solely to the manner in which such offenders "shall be sentenced[,]" *id.*, and says nothing about whether and to what extent a federal court can *alter* a sentence that it previously imposed for such offenders.  And, as explained, such modifications are the sole province of the jurisdictional prescriptions in section 3582(c).  *Cf. Dillon v. United States*, 560 U.S. 817, 825 (2010) (concluding that "§ 3582(c)(2) does not authorize a sentencing or resentencing proceeding" but rather "provides for the 'modif[ication of] a term of imprisonment' by giving courts the power to 'reduce' an otherwise final sentence" (alteration in original)).

that this Court can—and should—evaluate Greene's motion under the D.C. Code's compassionate release statute, because that local statute contains "broad language" that could be construed as applicable not only to D.C. Superior Court judges, but also to any "court that is sentencing a D.C. Code offender."  (Mot. Hr'g Tr. at 11:13–17.)  But the Government does not explain its apparent conclusion that the D.C. Council has authority to dictate the circumstances under which a federal court can reduce a term of imprisonment that it previously imposed on D.C. Code offenders, nor does the Government provide any theory as to *why* Congress would have intended that result.[10] Moreover, there is no indication that the D.C. compassionate release statute was meant to apply to the circumstance in which a D.C. Code offender is serving a sentence that was previously imposed by a federal court.  To the contrary, in a press release issued after the enactment of D.C. Code § 24-403.04, the D.C. Corrections Information Council explained that the provision "expanded the eligibility of DC Code Offenders *to apply to the Superior Court* for compassionate release."  DC Corrections Information Council, *Update on Implementation of DC Code 24-403.04 Motions for Compassionate Release*, DC.gov (Aug. 27, 2020) (emphasis added).[11]

---

[10] To fully appreciate the untenable nature of the assertion that the D.C. Council can determine whether a federal court is authorized to alter a sentence that it previously imposed upon a D.C. Code offender, imagine that Congress had not provided any exceptions to its pronouncement in the U.S. Code that "[t]he court may not modify a term of imprisonment once it has been imposed[.]"  18 U.S.C. § 3582(c). In that hypothetical situation, the federal courts would plainly lack any congressional authority to modify previously imposed sentences, but the result of the Government's argument would be that, contrary to federal law, federal courts *could* modify the sentences of individuals whom that court had previously sentenced for violating the D.C. Code.  In other words, if the Government's view is correct, the D.C. Council could permit (or perhaps require) federal courts to do the very thing that Congress had forbidden them to do with respect to sentencing offenders.  This Court sees nothing in the U.S. Code or the D.C. Court Reform and Criminal Procedure Act that suggests that Congress intended to cede such power to local authorities.

[11] This statement of the D.C. Corrections Information Council is located at https://cic.dc.gov/release/update-implementation-dc-code-24-40304-motions-compassionate-release.

The Government's suggestion that, because D.C. Code offenders are categorically ineligible for relief under section 3582(c)(1)(A) of Title 18 of the U.S. Code, the D.C. Code's compassionate release provision *must* be applicable to them even if they were sentenced by a federal court (*see* Gov't Opp'n at 1 n.1), fails simply and solely because the Government's contention that D.C. Code offenders are not entitled to compassionate release under section 3582(c)(1)(A) is wrong. To sustain this view, the Government points to a BOP regulation that represents that agency's determination that it "has no authority to initiate a request under [the federal compassionate release statute] on behalf of D.C. Code offenders confined in federal institutions." (*See id.* (citing 28 C.F.R. § 571.64).) But such a pronouncement cannot override, or contradict, the plain text of section 3582(c)(1)(A), and as amended by the First Step Act, section 3582(c)(1)(A) permits federal courts to reduce a previously imposed term of imprisonment "upon motion of the Director of the [BOP], *or upon motion of the defendant* after the defendant has fully exhausted all administrative rights to appeal[.]" 18 U.S.C. § 3582(c)(1)(A) (emphasis added). Given that the defendant himself can now bring a motion for compassionate release under section 3582(c)(1)(A) without the BOP's approval, the fact that the BOP has a policy that precludes the agency from initiating a request for a sentence modification on behalf of D.C. Code offenders says nothing about a federal court's ability to modify the term of imprisonment that it previously imposed on such a D.C. Code offender upon the defendant's request. *See United States v. Hammond*, No. 02-cr-294, 2020 WL 1891980, at *6 (D.D.C. Apr. 16, 2020) ("[W]hether BOP believes it possesses the power to move for compassionate release on behalf of a particular defendant has little bearing on whether a *court* may

26

grant relief to a defendant under the compassionate release provision when the defendant himself has filed such a request.").

Greene's argument that this Court should nevertheless apply the D.C. compassionate release statute under the circumstances presented here fares no better. First, Greene asserts that, because the Court has jurisdiction over his D.C. Code offenses—and, according to the D.C. Circuit, "'[d]efendants found guilty of violations of the D.C. Code can only be sentenced under the D.C. Code'" (Def.'s Reply at 2 (quoting *United States v. Cutchin*, 956 F.2d 1216, 1219 (D.C. Cir. 1992)))—the Court necessarily "has the power to apply the D.C. Code provisions allowing [Greene] to modify his D.C. Code sentence" (*id.* at 3).  But Greene reads far too much into the D.C. Circuit opinion on which he relies.  Properly understood, *Cutchin* stands merely for the unremarkable proposition that federal courts must apply the applicable sentencing guidelines and statute of conviction when determining what sentence to impose, *see* 956 F.2d at 1219, which, in the case of a D.C. Code offender, means applying the D.C. Voluntary Sentencing Guidelines and the specific D.C. Code provision that the defendant was convicted of violating, *see United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016) (citing *Cutchin* and noting that "the federal Sentencing Guidelines do not apply to the sentencing of D.C. offenses[,]" just as "the D.C. Voluntary Sentencing Guidelines do not apply to the sentencing of federal offenses").  That is not a holding that relates in any respect to whether the federal court has the power to change a term of imprisonment that was previously and properly imposed.

Moreover, and in any event, once the defendant is sentenced, either pursuant to federal statutes and guidelines or under the D.C. Code, the federal court has imposed a legally enforceable consequence for the defendant's criminal conviction, and thus, for

all intents and purposes, the defendant has received a *federal* sentence.  Consequently,

the defendant can move to vacate, set aside, or correct that sentence only by filing a

motion under federal law, *see McCall v. Swain*, 510 F.2d 167, 185 n.53 (D.C. Cir.

1975), as Greene himself did in this case, *see Greene II*, 834 F.2d at 1070, and such a

defendant cannot seek relief by filing a motion under the provision of the D.C. Code

that would otherwise apply had the defendant been sentenced for the same crimes in

Superior Court, *cf. United States v. Frady*, 456 U.S. 152, 159–62 (1982).  Stated

simply, a sentence that is imposed in federal court for a violation of the D.C. Code is no

less of a federal sentence than one that a federal court imposes for a violation of the

U.S. Code, and, for the reasons already explained, a previously imposed federal

sentence can be modified only pursuant to the federal scheme that Congress provided in

section 3582(c)(1)(A).[12]

Greene's alternative argument for applying the D.C. compassionate release

statute sounds in equity, and as such, it also has no bearing on the Court's ability to

proceed as he proposes.  In particular, Greene suggests that the Court can choose

between the potentially applicable standards (the D.C. Code *or* the U.S. Code) at its

discretion, and that this Court should opt to apply the D.C. Code's compassionate

release statute to his motion, because, in his view, the D.C. Code's standards for relief

are more favorable to a prisoner in his situation than those of the federal statute.  (*See*

---

[12] It is true that, for a limited number of years after Congress passed the D.C. Court Reform and
Criminal Procedure Act, federal courts were essentially required in some instances to "function[] as
[local] court[s]" when presiding over cases involving D.C. Code offenses.  *Belt*, 514 F.2d at 843.  But
that situation applied only in a narrow set of circumstances during a "transitional period" in which
federal courts "temporarily" presided over cases with indictments for exclusively D.C. Code offenses in
order to help facilitate the "transfer of jurisdiction" from federal courts to the new local court system.
*See id.* at 842–43.  Even then, however, federal courts were *not* considered to be stepping into the shoes
of Superior Court judges when presiding over local offenses properly joined with federal offenses
under D.C. Code § 11-502(3).  *See id.* at 844.  Thus, to the extent that Greene suggests that this Court
must act as a local court whenever presiding over matters in his case, he is incorrect.

Def.'s Reply at 6–7.)  For example, Greene emphasizes that the D.C. statute makes prisoners categorically eligible for compassionate release if they are at least 60 years old and have served at least 25 years in prison, *see* D.C. Code § 24-403.04(a)(2), while the comparable provision in the federal statute provides that defendants will be eligible if, among other things, they are at least 70 years old, and have served at least thirty years "pursuant to a sentence imposed under section 3559(c)" of Title 18 of the U.S. Code, 18 U.S.C. § 3582(c)(1)(A)(ii).  And because Greene is not serving a sentence imposed under section 3559(c), he contends that the only way that he can demonstrate eligibility under the federal statute is if he can follow the statute's alternative path and identify extraordinary and compelling reasons that justify his release—a requirement that he believes imposes "a stricter standard of proof than either the [D.C.] Council or Congress intended to apply to older long-time prisoners like [himself]."  (*See* Def.'s Reply at 6–7.)

The primary problem with this argument is the fact that it assumes that this Court has the authority to select the compassionate release standard that is the least onerous for defendants, when, as has already been explained, the circumstances under which a federal district judge can modify a previously imposed sentence are dictated by Congress, notwithstanding any allegedly less burdensome pathway that the D.C. Council has prescribed for the Superior Court.  This Court is not aware of a legal principle that permits a federal court to apply a different jurisdiction's standards and procedures if doing so would make it easier for a defendant to obtain relief, and Greene has not pointed to any source of law that suggests as much.  Furthermore, and for what it is worth, it is not at all clear that the federal compassionate release statute, as a whole, actually *does* impose substantially more onerous eligibility criteria than the D.C.

statute, given that the Sentencing Commission has interpreted "extraordinary and compelling" reasons to encompass a defendant's medical conditions, age, and family circumstances, *see* U.S. Sent'g Guidelines Manual § 1B1.13 cmt. n.1, as will be explained in a more fulsome manner below.

The bottom line is this: notwithstanding the fact that the federal district court previously sentenced Greene for both federal and local crimes and that he is currently being detained for the local crimes alone, federal courts derive their sentencing authority from Congress under federal law, and, by their nature, compassionate release statutes dictate the criteria and procedures pursuant to which a federal court can modify a term of imprisonment that it previously imposed.  Therefore, this Court is confident that *federal* standards govern its determination of whether and to what extent Greene's previously imposed federal sentence may be modified in response to his request for compassionate release, which means that this Court lacks authority to change Greene's sentence pursuant to the compassionate release standards that the D.C. Council has adopted.  Accordingly, if it is to be considered by this Court at all, Greene's motion for compassionate release *must* be construed as a motion for release under section 3582(c)(1)(A).

### B.    Given The Standards Set Forth In Section 3582(c)(1)(A), Greene's Motion For Compassionate Release Is Properly Before This Court, And The Requested Modification Of His Sentence Is Warranted

As previously explained, a federal court can entertain a defendant's motion for compassionate release under section 3582(c)(1)(A) only if the defendant has exhausted his administrative remedies or if the court finds that equitable considerations, such as futility, excuse the defendant's failure to meet the statute's exhaustion requirement. *See supra* Part II.A; *see also Johnson*, 464 F. Supp. 3d at 26–27, 29.  After this

threshold requirement is satisfied, the court must then determine whether "extraordinary and compelling reasons" exist that warrant reducing the defendant's term of imprisonment, *see* 18 U.S.C. § 3582(c)(1)(A)(i), and, if so, whether the purposes of punishment set forth in section 3553(a) require the defendant's continued incarceration despite the extraordinary and compelling circumstances that would otherwise justify his release, *id.* § 3852(c)(1)(A); *Johnson*, 464 F. Supp. 3d at 30–31.

For the reasons that follow, it is readily apparent that administrative exhaustion would have been futile in the instant case, and that "extraordinary and compelling" reasons for Greene's release exist, as defined by and identified in the Sentencing Guidelines Manual.

1.   <u>It Would Have Been Futile For Greene To Attempt To Exhaust Administrative Remedies</u>

To satisfy section 3582(c)(1)(A)'s exhaustion requirement, a defendant must request that the BOP file "an agency-sponsored motion for compassionate release" on his behalf, *Johnson*, 464 F. Supp. 3d at 36, and then either "exhaust[] all administrative rights to appeal" the BOP's failure to file such a motion, 18 U.S.C. § 3582(c)(1)(A), or wait 30 days from the date upon which the warden first receives the defendant's request, "whichever is earlier," *id.*, before seeking relief from the court.  The purpose of this statutory requirement is to give the BOP "breathing room to take a first look at compassionate release motions" and determine its position on a given request before the defendant turns to the court.  *See United States v. Morris*, No. 12-cr-154, 2020 WL 2735651, at *5 (D.D.C. May 24, 2020).  Notably, however, with the First Step Act's amendment to section 3582(c), Congress also intended to "expand[] the use of compassionate release by removing the BOP as a gatekeeper to judicial consideration of

31

sentence reduction motions." *United States v. Price*, No. 07-cr-0152-06, 2020 WL
5909789, at *2 (D.D.C. Oct. 6, 2020).  Thus, section 3582(c)(1)(A) permits a defendant
to clear the exhaustion hurdle either by fully pursuing the administrative request and
appeal process, or by merely asking the BOP to file a motion on his behalf and then
waiting 30 days before filing a motion with the court, whether or not the BOP has
responded to or denied the defendant's request.

This Court and others have concluded that section 3582(c)(1)(A)'s exhaustion
requirement is *not* jurisdictional in the sense that a court is barred from hearing an
unexhausted claim.  *See Johnson*, 464 F. Supp. 3d at 28 (collecting cases).  Instead, the
requirement "is best understood" as a "claims processing rule that determines who
moves for release and when." *United States v. Jennings*, No. 18-cr-17, 2020 U.S. Dist.
LEXIS 70800, at *4–5 (D.D.C. Apr. 22, 2020); *see also Fort Bend Cty. v. Davis*, 139 S.
Ct. 1843, 1849 (2019) (explaining that "nonjurisdictional claim-processing rules . . .
seek to promote the orderly progress of litigation by requiring that the parties take
certain procedural steps at certain specified times" (internal quotation marks and
citation omitted)).  As such, a court can excuse or waive section 3582(c)(1)(A)'s
exhaustion requirement for equitable reasons, including if, for example, exhaustion
would be futile, meaning "'completely ineffective'" and "'not . . . lawfully and
reasonably sufficient.'" *See Randolph-Sheppard Vendors of Am. v. Weinberger*, 795
F.2d 90, 107 (D.C. Cir. 1986) (alteration in original) (quoting *Webster's New Collegiate
Dictionary* 468 (1977)).  It is also well established that "[r]esort to the administrative
process" will generally be considered futile "if the agency will almost certainly deny
any relief either because it has a preconceived position on, or lacks jurisdiction over,
the matter." *See id.*  Thus, courts in this district have excused a defendant's failure to

exhaust his administrative remedies under section 3582(c)(1)(A) on futility grounds in situations such as when the BOP had made clear that it would not file a compassionate release motion on behalf of a defendant who is not presently detained in a BOP facility, *see Johnson*, 464 F. Supp. 3d at 36, and when it was "highly unlikely that [the] BOP would consent" to the defendant's release because the government had already expressed its opposition to the defendant's motion, *see United States v. Brown*, No. 92-cr-345, 2020 U.S. Dist. LEXIS 160789, at *11 (D.D.C. July 2, 2020).

In the instant case, there is no dispute that Greene did not exhaust his administrative appeal rights nor did he undertake to request that the BOP file a motion for compassionate release on his behalf.  (*See* Gov't Opp'n at 1 n.1; Def.'s Reply at 8.) Instead, presumably because Greene mistakenly believed that the D.C. Code applied and thus that exhaustion was not required, the motion for compassionate release that he filed in this Court was the opening salvo in his quest to obtain a modification of his sentence.

Greene's failure to at least ask the BOP for relief would ordinarily bar his attempt to proceed in federal court, and the Government argues as much here.  (*See* Mot. Hr'g Tr. at 12:18–23.)  But this Court has not seen a clearer set of circumstances warranting application of the well-established futility doctrine.  Indeed, by the Government's own admission, it is the BOP's long-held position that D.C. Code offenders who have been sentenced in federal court—like Greene—are categorically ineligible for relief under section 3582(c)(1)(A).  (*See* Gov't Opp'n at 1 n.1; Mot. Hr'g Tr. at 13:16–14:10.)  Consequently, the BOP would have most certainly denied Greene's request for the filing of a section 3582(c)(1)(A) motion.  *See Randolph-Sheppard Vendors*, 795 F.2d at 107.  And under such circumstances, there is simply no

reason to require Greene to undertake the futile gesture of seeking the BOP's

assistance, and also no point in requiring Greene to wait a month to allow the agency to

provide its negative response before filing his motion in federal court.  *See, e.g.*,

*Morris*, 2020 WL 2735651, at *6 (waiving section 3582(c)(1)(A)'s exhaustion

requirement on futility grounds); *see also Jennings*, 2020 U.S. Dist. LEXIS 70800, at

*4–5 (same).

>    2.    <u>Greene's Age, Length of Incarceration, And Age-Related
>          Deterioration In Health Provide Extraordinary And Compelling
>          Reasons For Reducing His Term of Imprisonment</u>

With exhaustion addressed, the Court turns to the substantive standards for

modification of a previously imposed term of imprisonment under section

3582(c)(1)(A), and considers the extent to which compassionate release may be

warranted in this case.  Based on the instant record, it is clear to this Court that

extraordinary and compelling circumstances warrant a reduction in Greene's term of

imprisonment within the meaning of section 3582(c)(1)(A).

Section 1B1.13 of the Guidelines Manual—which Congress mandated, *see* 28

U.S.C. § 994(t), and which section 3582(c)(1)(A) specifically incorporates by

reference—establishes that the defendant's age, or serious medical conditions, or family

circumstances can provide "extraordinary and compelling reasons" for a sentence

reduction.  *See* U.S. Sent'g Guidelines Manual § 1B1.13 cmt. n.1.  In particular, and as

relevant here, section 1B1.13 has commentary that addresses the "Age of the

Defendant" and provides that if the defendant "is at least 65 years old"; has "served at

least 10 years or 75 percent of his . . .  term of imprisonment, whichever is less"; and is

"experiencing a serious deterioration in physical or mental health because of the aging

process[,]" then extraordinary and compelling reasons for release exist. *Id.* § 1B1.13 cmt. n.1(B).

Based on the factual representations in Greene's motion and at his motion hearing, this Court has no doubt that Greene meets those criteria: he is 72 years old, has served 49 years in prison, and his medical records show that he suffers from a litany of physical ailments, including hypertension, shingles, dermatitis, abdominal hernia, and urinary incontinence. (*See* Ex. GG to Def.'s Mot., ECF No. 12-1, at 132.) And perhaps most significantly, in terms of Greene's physical deterioration, Greene's counsel represented that his age-related urinary incontinence has reached the point in which it significantly disrupts his sleep and hinders his day-to-day functioning—to the extent that he had to waive his presence at the motion hearing in this case. (*See* Mot. Hr'g Tr. at 26:3–23.)

The Government does not dispute that Greene satisfies the age and time in prison requirements of section 1B1.13, nor does it appear to challenge the representation that Greene is experiencing a deterioration in his health. Rather, the Government argues that Greene's demonstrated health-related issues are not sufficiently *serious*, because he does not "requir[e] a medical facility placement" (*see id.* at 32:16–17), and because the BOP has classified him as a "care level 1 inmate[,]" meaning that he is "healthy or [requires] simple chronic care" (*id.* at 29:10–13). But, notably, nothing in the "Age of the Defendant" commentary mandates a showing of that sort. That is, the Sentencing Commission does not suggest that a demonstration that a 65-plus-year-old defendant necessitates intensive treatment because of his deteriorating health, or that he is unable to care for himself, is required; to the contrary, a mere showing that the defendant is

experiencing "a serious deterioration in physical or mental health because of the aging process" suffices.  *See* U.S. Sent'g Guidelines Manual § 1B1.13 cmt. n.1(B).[13]

Thus, in this Court's view, and as relevant here, the commentary to guidelines section 1B1.13 permits a fact-specific, flexible analysis of potentially extraordinary and compelling reasons for release that turns on the defendant's age and the particular conditions and circumstances presented by his physical and mental health.  And for defendants who meet the threshold age requirement, medical conditions that "impair[]" a defendant's "basic human functions" plainly suffice.  *See United States v. Ebbers*, 432 F. Supp. 3d 421, 429 (S.D.N.Y. 2020) (explaining that the "Age of the Defendant" provision "applies to senior-citizen defendants who have already spent over ten years in prison and whose physical . . . deterioration has impaired basic human functions").  So it is here: Greene is 72 years old, has served nearly fifty years in prison, and has a number of medical issues that are associated with the aging process and that have significantly deteriorated his health and basic functions.  Therefore, this Court finds that Greene has presented extraordinary and compelling circumstances that warrant his

---

[13] To the extent that the Government interprets the adjective "serious" to suggest near incapacitation, a close reading of the commentary counsels otherwise.  In the guideline commentary concerning "Medical Condition of the Defendant[,]" *see* U.S. Sent'g Guidelines Manual § 1B1.13 cmt. n.1(A)(ii)— which is listed separately from "Age of the Defendant" as an alternative basis for concluding that "extraordinary and compelling" reasons for release exist—the Sentencing Commission explicitly requires not only that the defendant is "suffering from a *serious* physical or medical condition," or a "*serious* functional or cognitive impairment," or that the defendant is "experiencing deteriorating physical or mental health because of the aging process," but also that such condition "*substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover*[,]" *see id.* (emphasis added).  Such qualifying language appears nowhere in the "Age of the Defendant" discussion.  And had the Sentencing Commission intended the word "serious" alone to signify that a defendant must be terminally ill or require significant care, then the explicitly worded additional qualification in the "Medical Condition of the Defendant" provision would not have been necessary.

release under section 3582(c)(1)(A) of Title 18 and section 1B1.13 of the Guidelines
Manual.

### C.   The Purposes Of Punishment Set Forth In Section 3553(a) Do Not Require Greene's Continued Incarceration

The final question that Greene's motion for compassionate release presents is
whether releasing Greene at this time, as the circumstances warrant, comports with the
purposes of punishment laid out in section 3553(a).  *See Johnson*, 464 F. Supp. 3d at
30–31.  This Court has consulted all of the relevant sentencing standards, *see* 18 U.S.C.
§ 3553(a)(1)–(2), and it has concluded that the almost five decades of imprisonment
that Greene has already served adequately achieves the purposes of punishment set
forth in section 3553(a), and that additional incarceration is not necessary to promote
those purposes, for several reasons.

Beginning with the "nature and circumstances" of Greene's offense, there is no
dispute that Greene committed a grave and serious crime.  Indeed, killing another
person (and especially a person who was on duty serving as a U.S. marshal) and
disarming three other federal officers while attempting to free a prisoner from custody,
is perhaps one of the most serious crimes a person can commit.  But the severity of the
offense of conviction is only one aspect of the nature and circumstances analysis, and it
does not, in and of itself, demonstrate that just punishment or any of the other purposes
of punishment require more time in prison than the nearly 50 years that Greene has
served for his commission of that crime.  Shortly after Greene committed the crime at
issue here, he was appropriately sentenced to a minimum of 35 years in prison to reflect
the seriousness of his actions, *see id.* § 3553(a)(2)(A), and he has now served
substantially more than this minimum sentence.  Thus, the central question becomes

whether, notwithstanding the unquestionably reprehensible nature of his offense, Greene has rehabilitated himself during the past 49 years that he has served in prison, and whether he has been sufficiently deterred from engaging in similar conduct in the future, such that he no longer poses a threat to society?

The record before this Court amply demonstrates that the rehabilitation, deterrence, and incapacitation goals of the lengthy prison sentence that the court imposed on Greene in 1972 have been satisfied.  As for Greene's rehabilitation, the sworn testimony of the various BOP officials who have spoken on his behalf during his Parole Commission hearings strongly supports the conclusion that Greene has reformed himself while in prison.  As described above, at Greene's parole hearing in 2015, seven BOP staff members (including Greene's case manager) appeared on his behalf, vouching for his exemplary behavior and genuine rehabilitation.  (*See* Ex. A to Def.'s Mot. at 2–3.)  And two of those BOP officials went so far as to declare that they would have "no problem" having Greene as their neighbor.  (*See id.* at 3.)  One former BOP official submitted a letter to this Court in support of Greene's motion for compassionate release stating that Greene was "a model inmate" and that she "couldn't be more confident in [her] recommendation for his release."  (McKenzie Letter at 30.)  Meanwhile, another BOP official, who interacted closely with Greene for over 12 years, wrote to the Court to explain that Greene had helped him keep peace within the prison community, and that, in his view, Greene should have been released many years ago.  (*See* Cantrell Letter at 32.)  Remarkably, both officers also noted that, in all their years at BOP, not once had they spoken out in support of an inmate's request for release.  (*See* McKenzie Letter at 30; Cantrell Letter at 32.)

The trust that Greene has earned among BOP officials is a testament not only to

his rehabilitation, but also to his present lack of dangerousness.  When evaluating the risk of releasing a defendant into the community, the Court must look beyond the inherent dangerousness of the offense that the defendant committed, and must consider the threat that the defendant posed at sentencing, and also the extent to which that threat remains at the time he seeks compassionate release.  *See, e.g.*, *Johnson*, 464 F. Supp. 3d at 40–41; *see also United States v. Dunlap*, No. 17-cr-207, 2020 WL 5231359, at *4 (D.D.C. Sept. 2, 2020).  While the transcript for Greene's original sentencing is unavailable, the Court has no doubt that Greene would have been considered profoundly dangerous at the time his sentence was imposed in the early 1970s; he had disarmed three U.S. marshals in a "crowded church," had fatally shot a marshal, and had "commandeered" a car at gunpoint.  *See Greene I*, 489 F.2d at 1147.  But the record provides no reason to believe that Greene *still* poses that same grave risk to other persons *now* after serving 49 years in prison.  To the contrary, it appears that Greene has steadfastly undertaken to serve others in his prison community during his incarceration, as evidenced by his decision to put his own life at risk to protect the lives of two correctional officers during a violent prison riot in 1989.  (*See* Fanucci Letter at 16.)  What is more, in the decades since that incident, Greene has routinely put the needs and safety of BOP staff and inmates before his own, in order to help prevent violent unrest within the prison community.  (*See* Ex. A to Def.'s Sealed Mot. at 3.)  Indeed, it is Greene's selfless efforts to quell danger over the years that has generated the highly unusual level of support that he has received from the numerous correctional officials who have consistently advocated for his release, both during his parole hearings and with respect to the instant motion.  In short, Greene's demonstrated dedication to ensuring the safety of inmates and officers points in only one direction

with respect to the Court's evaluation of his motion for release: that he no longer presents the significant risk of danger that his offense of conviction suggests, and that conclusion is all the more compelling given his advanced age and medical issues, and the fact that the BOP has determined that Greene has a minimal risk of recidivism (*see* Ex. T to Def.'s Mot., ECF No. 12-1, at 68). *See also, e.g.*, *Hammond*, 2020 WL 1891980, at *10 (noting that the defendant's "advanced age and reduced mobility . . . make it difficult to imagine that he will endanger the community").

The fact that Greene has incurred some disciplinary infractions during his time in prison (*see* Ex. U to Def.'s Mot., ECF No. 12-1, at 70–71) does not undermine this finding. It is not unusual for inmates to receive reprimands in the prison context. Moreover, the nature of Greene's infractions does not raise the kinds of concerns that might reasonably cast doubt on the conclusion that his release would not pose a danger to society. For example, the two most serious infractions in Greene's record are apparently for flinging grits at a BOP official in 2011, and for verbally lashing out in 2016 after the BOP confiscated a tool that he used for artwork (a tool that the BOP considered to be a "dangerous weapon"). (*See id.*; *see also* Def.'s Mot. at 18–19; Cantrell Letter at 32.) These actions may well warrant disciplinary infractions within the BOP, but they do not, on their own, indicate that Greene poses a danger to others— especially in light of his repeated efforts to keep those in his community safe. (*See* Cantrell Letter at 32 (stating that, notwithstanding Greene's 2016 infraction, Greene does not "have much of a disciplinary history at all within the BOP"); *see also id.* (explaining that, as someone who has "been in law enforcement for 30 years," he is

"familiar with what it means to work with dangerous individuals").)[14]

The Government opposes the conclusion that releasing Greene at this time would be consistent with the purposes of punishment set forth in section 3553(a), and urges the Court to deny Greene's motion for compassionate release for three main reasons: (1) Greene committed an "egregious" and violent crime (*see* Gov't Opp'n at 9); (2) the Parole Commission has consistently found that Greene's release is "not compatible with the welfare of society" given the severity of his offense and his recent disciplinary infractions (*see id.* at 11 (internal quotation marks and citation omitted)); and (3) the U.S. Marshals Service has expressed its opposition to Greene's release (*see id.* at 12). In this Court's view, none of these objections is persuasive.

First, as explained above, the nature and circumstances of a defendant's offense of conviction is just one factor in the section 3553(a) analysis, and one that this Court has given due consideration. And to the extent the Government suggests that some crimes are just too egregious to warrant granting a defendant's request for compassionate release, this Court disagrees. In enacting section 3582(c)(1)(A), Congress clearly contemplated the possibility that defendants convicted of the most heinous crimes would seek—and, in appropriate cases, receive—compassionate release: subsection 3582(c)(1)(A)(ii) allows defendants *who are serving life sentences* for "serious violent felonies" to request compassionate release, if they are at least 70 years

---

[14] Greene's other disciplinary infractions while in BOP custody include "being insolent to [a] staff member" in 2020, "refusing to obey an order" in 2010, and "possessing an unauthorized item" and "being unsanitary or untidy" in 2005. (*See* Ex. U to Def.'s Mot. at 70–71.) According to the Government, Greene also incurred a number of violations from 1977 to 1998, during his time at Lorton Reformatory, including possession of controlled substances and "threatening conduct[.]" (*See* Gov't Opp'n at 10.) The record provides no information about the alleged Lorton incidents, and they are of minimal relevance given that they occurred over twenty years ago, as the Government readily conceded at oral argument (*see* Mot. Hr'g Tr. at 34:12–16). And none of the more recent infractions relate to, or are indicative of, violence or dangerousness.

old, have spent at least 30 years in prison, and are no longer a danger to the community, 18 U.S.C. § 3582(c)(1)(A)(ii) (expressly referencing 18 U.S.C. § 3559(c)).  Thus, the extremely serious and unspeakably violent nature of Greene's offense of conviction is not dispositive of his request for compassionate release.

It is also clear to this Court that, in placing so much emphasis on the horrendous nature of Greene's offense of conviction, the Government misunderstands the nuanced analytical framework that Congress has provided in section 3582(c), which plainly differentiates a sentence modification from other sentencing procedures.  Under section 3582(c), the default presumption is that the court cannot modify a previously imposed term of imprisonment, and that it can only change the sentence if the defendant presents extraordinary and compelling reasons that warrant such a reduction.  If the defendant makes that showing, the presumption then effectively shifts in favor of his release, and the court must determine whether any of the purposes of punishment set forth in section 3553(a) require keeping the defendant incarcerated nevertheless; that is, notwithstanding the extraordinary and compelling circumstances that would otherwise justify releasing him.  *See Johnson*, 464 F. Supp. 3d at 30–31.

Notably, nothing in this analysis authorizes the court to deny a motion for compassionate release simply and solely because the defendant's offense of conviction is an egregious and dangerous crime.  Rather, the court must reassess the purposes of punishment *in light of* the extraordinary and compelling reasons for reducing the term of imprisonment that was previously imposed for such an egregious offense, and must thereby evaluate, for instance, whether the defendant remains too dangerous to release, or whether he has not yet served enough of the sentence to have been justly punished for his offense.  Here, for the reasons already discussed, the Court finds that Greene's

advanced age, medical conditions, and 49 years in prison are extraordinary and compelling reasons that justify his release, and that continued incarceration is not necessary either to provide just punishment for the horrific crime that he committed almost fifty years ago or to further promote his rehabilitation, nor is he likely to commit another offense due to his age and medical issues.  (*See supra* Part III.B.2.)

For largely the same reason, the Court also firmly rejects the Government's reliance on the Parole Commission's repeated decisions to deny Greene parole.  The Parole Commission and a federal court have decidedly different aims with respect to evaluating release requests, and they do so by applying markedly different standards. The federal court must apply the criteria that Congress has established in section 3582(c)(1)(A), which includes the analysis of the applicable section 3553(a) factors in the manner described above, to determine whether there are extraordinary and compelling reasons to modify a defendant's sentence, and, if so, whether the purposes of punishment require rejection of the release request.  By contrast, the Parole Commission seeks to determine a defendant's "suitability" for release based on specific guidelines, *see Daniel v. Fulwood*, 766 F.3d 57, 59–60 (D.C. Cir. 2014) (citing 28 C.F.R. § 2.80), and it can refuse to grant parole if, for instance, the Commission determines that the defendant's offense of conviction involved "[u]nusual cruelty to the victim" or if the defendant presents an "[u]nusual propensity to inflict unprovoked and potentially homicidal violence, as demonstrated by the circumstances of the current offense[,]" *see* 28 C.F.R. § 2.80(n)(2)(ii).  This critical distinction necessarily means that the Commission's parole determinations carry little weight in the context of this Court's section 3582(c)(1)(A) analysis, and that is the case even prior to the specific recognition that the Parole Commission's decisions here may not have taken into

account Greene's substantial efforts to keep the prison community safe.  (*See* Ex. A to Def.'s Mot. at 6–7; Ex. F to Gov't Opp'n at 1; *see also* Ex. E to Gov't Opp'n at 1.)[15]

Finally, with respect to the Government's contention that the U.S. Marshals Service forcefully opposes Greene's release, the Court again directs the Government to the comprehensiveness of this Court's record analysis.  When a defendant presents extraordinary and compelling reasons for his release, the Court must reassess the applicable factors in section 3553(a) and consider *all* of the available evidence, including any opposition to the defendant's release.  The letter that the Director of the U.S. Marshals Service submitted to oppose Greene's release is one such piece of evidence, and the Court fully appreciates the Director's strongly held view that Greene's crime warrants a life sentence.  (*See* Ex. G to Gov't Opp'n, ECF No. 13-5, at 1.)  Yet, the sentencing court previously imposed a sentence of 35 years to life for Greene's horrendous crime, and Greene has now served 49 years in prison, during which it appears that he has been fully reformed.  Thus, after viewing the record as a whole and applying the nuanced legal standards that are applicable to the consideration of a defendant's motion for compassionate release under section 3582(c)(1)(A), the Court is confident that reducing Greene's term of imprisonment is consistent with the

---

[15] The Court is likewise unmoved by the Government's argument that Greene's various statements during Parole Commission proceedings should disqualify him from compassionate release.  (*See* Gov't Opp'n at 4–5 (focusing on statements that Greene made to the Parole Commission in 2009, when he suggested that the shooting was an accident and that the guns "just started firing" (citing Ex. L to Def.'s Mot. at 37)); *see also* Mot. Hr'g Tr. at 38:4–12 (noting that Greene continues to dispute the Parole Commission's assertion that he shot the marshal when the marshal was already on the ground).)  Greene's characterization of his offense at a parole hearing over ten years ago says little about the extent of his remorse today, particularly when compared with the more recent evidence in the record attesting to Greene's sorrowful acceptance of responsibility for his actions.  (*See, e.g.*, Ex. A to Def.'s Mot. at 4, 6; McKenzie Letter at 30; Cantrell Letter at 32.)  And while Greene continues to object to certain details of the Commission's account of his offense (*see* Ex. M to Def.'s Mot. at 40–41; Def.'s Reply at 10), he has never implied that he did not commit the instant crime or that he does not fully appreciate the consequences of his actions.

purposes of punishment set forth in section 3553(a).

## IV.   CONCLUSION

In extraordinary cases, federal courts may exercise their limited authority to reduce a sentence that the court previously imposed, and they may do so only in accordance with the specific procedures and criteria that Congress has provided in section 3582(c)(1)(A).  Applying those standards to the instant case, the Court concludes that it must exercise its authority here.  For the reasons explained fully above, the Court finds that Greene's advanced age, lengthy period of incarceration, and age-related deterioration in health constitute extraordinary and compelling reasons to reduce his sentence.  And the Court further finds that, after 49 years in prison, Greene's continued incarceration would be greater than necessary to comply with the purposes of punishment identified in section 3553(a).  Accordingly, and as set forth in the accompanying Order, Greene's motion for compassionate release will be **GRANTED** and his term of imprisonment will be reduced to a sentence of **TIME SERVED**.


DATE:  February 2, 2021                        *Ketanji Brown Jackson*
                                               KETANJI BROWN JACKSON
                                               United States District Judge